UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| JO Y. RICHARDSON, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | Case No. 4:12 CV 543 CDP |
| DAMON BERTI, et al. | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This case comes before me on a motion for summary judgment filed by defendants Sheriff Gary Toelke and the County of Franklin, Missouri. Plaintiff alleges that defendant Damon Berti, a former correctional officer and sheriff's deputy, sexually assaulted her while she was housed as a pretrial detainee in the Franklin County jail. Plaintiff's suit includes counts against Franklin County and Sheriff Toelke in both his individual and official capacities under 42 U.S.C. § 1983 for failure to properly hire,[1] train, supervise, and protect in derogation of her Fourth and Fourteenth Amendment rights. I will grant summary judgment as to the individual capacity claims against Sheriff Toelke, because plaintiff fails to provide evidence as to his subjective knowledge of constitutional deficiencies. I will otherwise deny summary judgment.

---

[1] In her Memorandum in Opposition, Richardson abandons her claims relating to hiring.

## 1. Background

The following facts have been recited in a light most favorable to plaintiff and are set forth for the purposes of ruling on this motion only. Plaintiff was a pre-trial detainee in custody of Franklin County and was housed in its jail when she was sexually assaulted by Deputy Sheriff Damon Berti on March 5, 2010. Berti entered her housing pod alone between 3:00 and 4:00 a.m. He was not seen by any officer on duty. Berti ordered her into a shower area, where he forced her to have oral and vaginal sex under threat of being maced. Berti later confessed and was convicted of unlawful sexual contact.[2]

The Department requires its applicants to complete a one year P.O.S.T. approved course of instruction that includes instruction on the unlawful sexual contact law under which Berti was convicted. In addition to the P.O.S.T. training, deputies are required to complete the National Sheriff's Association *Jail Officer's Training Program* correspondence course, six months of supervised field training, and a one-year probationary period. Although Berti's training record included low marks for violating department policy by entering housing pods alone, his field training was determined to be complete and was cut short by three months.

In March 2010, there were approximately thirty deputies in the Department, of which three were female. Doc. 42-4 at p. 3. There are usually five to seven

---

[2] R.S. Mo. § 566.145 prohibits a jailer from engaging in sexual intercourse or oral sex with a person in custody; consent is not an affirmative defense.

corrections officers and/or supervisors at the jail each shift. On the evening shift, one officer is placed at the control center, one at the booking desk, one at the jail desk, and one is a "roamer." The shift supervisor primarily rotates between the jail desk and the booking desk, but will often leave the facility to get sodas. The shift supervisor notifies the other officers when he leaves. The female housing pods are not immediately visible from either the booking desk or the jail desk; as a result, the jail relies upon the control center to monitor that unit. Doc. 42-7 at p. 4–6.

The jail has a video camera that is pointed at the door of the female housing module and which is monitored by a deputy in the control center. However, it is considered acceptable for the monitoring deputy to stop watching the viewing screens for ten to fifteen minutes at a time. Doc. 42-4 at p. 7; 42-5 at p. 6. The monitoring deputy is supposed to keep track of significant events in a logbook; however, the deputy has discretion in determining what is significant. Doc. 42-5 at p. 6. Although a male deputy entering a female inmate housing pod alone would be significant, it would not be recorded in the logbook. Doc. 42-5 at p. 7. Failure to keep an accurate logbook was not disciplined. Doc. 42-8 at p. 10.

The Department and Franklin County had a policy against sexual harassment in the workplace that required reporting sexual harassment directly to supervising officers. No training was provided to the deputies on how to prevent either sexual

harassment or sexual abuse.³ Doc. 42-3 at p. 3–4. Berti's superior, Sergeant Delatorre,⁴ testified at his deposition that he had not been trained on how to prevent sexual abuse or harassment, but that he had read the policy manual that describes what to do if you feel like you are a victim of harassment. Doc. 42-8. Captain David Boehm testified that the duty of an observing officer to report the harassment of another depended upon whether the victim of the harassment was perceived to find it offensive. Doc. 42-9 at p. 3.

It is Department policy that every staff member is a supervisor and so is obligated to report violations of policy and that this reporting should continue up the chain of command. Despite this policy and the "zero-tolerance" sexual harassment policy, Berti was never identified as posing a threat to the female inmates or to his coworkers.

On several occasions during his tenure with the Sheriff's Department, Berti was seen violating the Department's policy that deputies only enter an inmate's housing module in pairs except during emergencies.⁵ These violations were not unique to Berti; one deputy stated during a deposition that she and the other deputies had on several occasions entered the housing modules solo and that she

---

³ It is unclear from the record whether the P.O.S.T. training covered these areas.
⁴ Sergeant Delatorre has since been promoted to Lieutenant.
⁵ Current and past officers and deputies within the Department disagree on whether the policy was for the officers' protection solely or in addition to the inmates'; there is also some dispute as to whether the policy was even in place.

had seen male deputies enter female pods alone. Although Berti's supervisor was informed of his violations, Berti continued to violate the policy. Deputy Stephanie Reynolds also saw Berti choke an inmate unprovoked, and she reported the incident to her corporal. Doc. 42-4 at p. 5–6. Berti was not formally punished for any of these policy violations.

Beginning during his probationary period and extending until his resignation, Berti engaged in progressively worsening sexual conduct towards his coworkers. Berti made sexually explicit gestures and comments towards more than one deputy. Another female employee asked a deputy to keep Berti from entering the kitchen when she was there alone. Berti showed others graphic sexual photographs on his phone, sent nude photographs, and demanded that co-workers reciprocate. Some of this conduct occurred in the presence of other officers, who did not report it. One of the female deputies asked Sergeant Delatorre not to be placed on duty at the same station as Berti, but did not tell him she was being sexually harassed. Berti later forced that deputy to perform oral sex on him. Shortly thereafter, she requested an assignment away from the jail; she also told one other deputy about the assault.[6] No formal reports were made about these incidents until after the investigation into plaintiff's case began.

---

[6] There is nothing in the record indicating how that deputy treated the information.

Plaintiff's complaint includes claims against both the County and Sheriff Toelke as an official and an individual for the failure to train the jail staff on how to prevent sexual abuse of inmates by jailors, failure to properly supervise Berti, failure to protect plaintiff, and failure to use appropriate care in hiring and training Berti. The County and Toelke argue that they are entitled to summary judgment as to all of plaintiff's claims because there is no evidence that Berti was improperly hired, trained, or supervised and because plaintiff has not shown deliberate indifference with regards to her protection. Because plaintiff has abandoned her claims relating to Berti's hiring, I will not discuss that argument.

### 2. Standards Governing Summary Judgment

In ruling on summary judgment, the Court views the facts and inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden to establish the absence of a genuine issue of material fact and that the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in its pleadings, but must set forth by affidavit or other evidence specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(c). A party may not merely point to unsupported self-serving

allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in its favor. *Wilson v. Int'l Bus. Machs. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995). "The mere existence of a scintilla of evidence in support of the [party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *Davidson & Assoc. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005).

### 3. Discussion

The Fourteenth Amendment's Due Process Clause grants to state pretrial detainees rights that are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Mass Gen. Hosp.*, 463 U.S. 239, 244 (1983). In fact, the protections are greater for pretrial detainees, who have not been convicted of a crime; they may not be subjected to any punishment. *Bell v. Wolfish*, 441 U.S. 520, 537 (1979). To succeed on a claim under the Due Process Clause, a pretrial detainee must show the defendant official was deliberately indifferent to his rights. *See Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006).

Deliberate indifference is treated differently when used to evaluate fault by a municipality than when applied to a prison official. *Walton v. Dawson*, No. 12-4000, 2014 WL 2053835, at *4 (8th Cir. May 20, 2014). No liability attaches to a prison official without subjective knowledge – that is, unless the prisoner can

prove the official both "knew of and disregarded an 'excessive risk to inmate health or safety.'" *Holden v. Hirner*, 663 F.3d 336, 341 (8th Cir. 2011) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). In contrast, when "applied to a municipality in the Fourteenth Amendment context, deliberate indifference is purely objective: 'liability [may] be premised on obviousness or *constructive notice*.'" *Walton*, 2014 WL 2053835, at *4 (alteration in original) (emphasis added) (quoting *Farmer*, 511 U.S. at 841).

3.1. <u>Municipal Liability Claims for Failure to Train, Protect, and Supervise</u>

Plaintiff has sued the County and Sheriff Toelke in his both his individual and official capacity as a policy maker. A suit against a government official in his or her official capacity is "another way of pleading an action against that entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978). "[T]he real party in interest in an official-capacity suit is the governmental entity and not the named official." *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Municipalities cannot be held liable on a *respondeat superior* theory under § 1983 for the acts of their employees, *Monell*, 436 U.S. at 694, but a municipality may be liable under § 1983 for acts for which the municipality itself is actually responsible. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988).

In *Monell*, the Supreme Court of the United States held that municipalities may be liable under § 1983 where "the action that is alleged to be unconstitutional

implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated" by the municipality. *Monell*, 436 U.S. at 690. Liability under *Monell* requires: (1) a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials; and (3) a showing that the policy or custom was the moving force behind the injury to the plaintiff's constitutional rights. *Jane Doe A v. Special Sch. Dist. of St. Louis Cnty.*, 901 F.2d 642, 646 (8th Cir. 1990). Liability attaches only where the decisionmaker possessed final authority to establish municipal policy. *Praprotnik*, 485 U.S. at 123; *City of Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

In *City of Canton v. Harris*, 489 U.S. 378 (1989), the Court expanded or clarified its municipal liability jurisprudence. It held that a city's failure to train its police officers could give rise to § 1983 liability. *Id.* at 378. Whether the failure to train constitutes a policy or custom does not require the existence of a continuing, widespread, and persistent pattern of unconstitutional misconduct like *Monell*. *Larson by Larson v. Miller*, 76 F.3d 1446, 1454 (8th Cir. 1996). Rather, the training or failure to train becomes the policy or custom required to be proven. If the policy itself is unconstitutional, then municipal liability can be established where the misconduct is linked to the unconstitutional policy. *City of Okla. City v.*

*Tuttle*, 471 U.S. 808, 823–24 (1985). But if the policy is not itself unconstitutional, "considerably more proof than the single incident will be necessary" to contribute fault to the municipality and establish the causal connection between the policy and the constitutional deprivation. *Id.* at 824.

Ultimately, the plaintiff must prove that (1) the county's training procedures were inadequate, (2) it was deliberately indifferent to the rights of its people in adopting the procedures, such that the failure to train reflects a deliberate or conscious choice by the county, and (3) the alleged deficiency actually caused the harm. *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996). Notice that the procedures were inadequate can be implied if (1) the failure to train is so likely to result in a constitutional violation that the constitutional violation was patently obvious or (2) a pattern of misconduct indicates the current training is insufficient to protect constitutional rights. *Larson*, 76 F.3d at 1454. A direct causal link between a municipal policy or custom and the alleged constitutional deprivation must be established. *Canton*, 489 U.S. at 390–91. The question becomes: "would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect." *Id.* at 391.

### 3.1.1 *Failure to Train*

Defendants argue that a deputy cannot be trained "not to rape." *Cf. Andrews*, 98 F.3d at 1077. The record shows that Berti was trained on Missouri's law against

sexual contact with an inmate and that he completed the mandatory one-year P.O.S.T. program without incident. Plaintiff has not shown that these training programs were constitutionally deficient. *See id.* (citing *Williams-El v. Johnson*, 872 F.2d 224, 230 (8th Cir. 1989)). Plaintiff has pointed to some other deficiencies in Berti's training, such as his entry into housing pods without another deputy present. However, the deficient training must be "closely related to the ultimate injury such that the deficiency in training actually caused the . . . offending conduct." *Id.* (internal quotation marks omitted) (quoting *Canton*, 489 U.S. at 391). Plaintiff fails to raise a question of fact on causation. For example, plaintiff has not shown the failure to train Berti to properly enter inmate cells caused him to commit rape. I therefore agree with the defendants that plaintiff cannot establish a constitutional violation related to Berti's training. However, plaintiff alleges deficiencies in training that go beyond Berti.

Defendants argue that there cannot be deficient training because the other deputies and supervisors knew how to identify and were required to report sexual harassment in the workplace. But neither of these principles address the real harm alleged by plaintiff in this case: that Sheriff Toelke and Franklin County implemented no policy or training designed to enable the deputies to identify potential threats against inmates posed by jailors, and that had they been provided

with proper training, other employees could have identified Berti as a threat and prevented the attack on plaintiff.

Plaintiff has introduced evidence that the County has not trained its deputies and officers in recognizing and preventing sexual harassment and abuse. Defendants argue that this does not amount to a constitutional violation, because the National Sheriff's Association *Jail Officer's Training Manual* provided sufficient training on "issues unique to working with female inmates." However, the defendants do not provide any information on the substance of the training, and the only portion of the manual in the record focuses on officer safety.[7] The County harassment policy requires the reporting of sexual conduct when it affects the work environment. Doc. 35-1 at p. 84. However, plaintiff has shown that despite this policy, Berti's sexual harassment of at least two deputies and one other female employee – including the forcible sexual assault of a deputy – went unreported and undisciplined. Plaintiff's evidence also gives rise to the inference that unless the victim actively exhibited signs that sexually aggressive behavior was unwanted, there was no requirement that it be reported by an observing officer. "[T]he existence of written policies of a defendant are of no moment in the face of

---

[7] The manual warns that male officers should, except in the case of emergency, be accompanied by another officer because they "could be walking into a trap" where, for example, women inmates "will use sexual activities or promises of sex to induce a male officer to do favors for their boyfriends . . . who are also inmates." Doc. 35-1 at p. 40.

evidence that such policies are neither followed nor enforced." *Ware v. Jackson County, Mo.*, 150 F.3d 873, 882 (8th Cir. 1998). A question of fact exists as to the adequacy of the county's training procedures. A question of fact also exists as to causation, because a jury could find that had department personnel received proper training, Berti would not have been able to rape plaintiff. *Cf. id.* at 884–85 (finding causation from failure to supervise an employee who presents an obvious risk).

The "inability or unwillingness of some prison administrators to take the necessary steps to protect their prisoners from sexual and physical assaults" has been described as a "national disgrace." *Walton*, 2014 WL 2053835, at *9 (quoting *Martin v. White*, 742 F.2d 469, 470 (8th Cir. 1984) (decrying failure to protect inmates from other inmates)). It has been estimated that approximately twenty percent of our country's inmates have been sexually assaulted by other inmates or by corrections staff. Kevin R. Corlew, *Congress Attempts to Shine a Light on a Dark Problem: An in-Depth Look at the Prison Rape Elimination Act of 2003*, 33 Am. J. Crim. L. 157, 159 (2006) (citations omitted). That training is needed to enable jail personnel to identify actual and potential threats to inmates and prevent their unconstitutional sexual assault by the jailers tasked with their protection is so patently obvious that it need no further discussion.

### 3.1.2 *Failure to Protect and Supervise*

The failure to adequately train jail personnel is closely tied to plaintiff's failure to protect and failure to supervise claims. Jailhouse policies and procedures do not exist in isolation; rather they form an interconnected web that must meet minimum constitutional standards. *Cf. Hutto v. Finney*, 437 U.S. 678, 687–88 (1978) (noting that constitutional violations require consideration of interdependent prison conditions). Plaintiff has provided evidence that the jail had a block of cells that was only regularly monitored by cameras, that the monitoring station was routinely left unattended, that procedural violations went unlogged, the buddy system policy was unenforced, and supervisors were untrained in detecting potential sexual assailants. There is some evidence that this laxness was common amongst a significant portion of the relatively small jailhouse staff. "It is fundamental that prison administrators are accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Falls v. Nesbitt*, 966 F.2d 375, 379 (8th Cir. 1992). However, constitutional violations arise where jail administrators disregard the very procedures that they determine are essential to maintaining the safety of their inmates. *Cf. Walton*, 2014 WL 2053835, at *7 (finding question for jury regarding unconstitutional risk of injury where jail left cells unlocked and conducted brief walkthroughs). It is a

question of fact as to whether these collective failures were so obviously deficient that they should have been remedied and as to whether they caused plaintiff's harm.

### 3.2 Individual Capacity Claims

For Sheriff Toelke to have violated plaintiff's constitutional rights, it must be shown that he (1) received notice of a pattern of unconstitutional acts committed by subordinates; (2) demonstrated deliberate indifference to or tacit authorization of the offensive acts; (3) failed to take sufficient remedial action; and (4) that such failure proximately caused injury to the plaintiff. *Otey v. Marshall*, 121 F.3d 1150, 1155 (8th Cir. 1997). Deliberate indifference with respect to individual capacity claims requires subjective, and not constructive, knowledge. *Walton*, 2014 WL 2053835, at *4.

Although plaintiff points to deposition testimony and police reports that indicate the deputies who Berti harassed or assaulted might have told some coworkers or Sergeant Delatorre about their problems with Berti, there are no facts showing that this knowledge extended to Sheriff Toelke. In fact, plaintiff provides no evidence that Sheriff Toelke actually knew of any deficiencies within the jail related to supervision or protection. During Toelke's twenty-one year tenure, no other inmate was sexually assaulted by a corrections officer, and only one deputy sheriff was alleged to commit any sexual assault before Berti. Likewise, plaintiff

adduces no evidence that Sheriff Toelke had actual knowledge that the jail personnel were not reporting sexual harassment or assaults or that their training in this aspect was deficient. Plaintiff therefore fails to show that Sheriff Toelke exhibited deliberate indifference to any constitutional violation, and Sheriff Toelke is entitled to summary judgment as to all claims against him in his individual capacity.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' for summary judgment [# 34] is granted only as to the individual capacity claims against Sheriff Toelke. The motion is denied in all other respects.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 28th day of May, 2014.